# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

_____

IN RE:
LAURA ALISON FAHRENZ,                              Chapter 7
             DEBTOR                              Case No. 05-24660-WCH

_____

LAURA ALISON FAHRENZ,
             PLAINTIFF,

                                Adversary Proceeding
v.                                                 No. 05-1657

EDUCATIONAL CREDIT MANAGEMENT
CORPORATION, THE EDUCATION
RESOURCES INSTITUTE, INC. AND
THE STUDENT LOAN CORPORATION,
             DEFENDANTS.

_____

## MEMORANDUM OF DECISION

## I. INTRODUCTION

The matter before the Court is the Complaint filed by Laura Allison Fahrenz (the "Debtor")

through which she seeks a determination that her student loan debt is dischargeable pursuant to 11

U.S.C. § 523(a)(8) on the basis that repayment would impose an undue hardship.  Educational Credit

Management Corporation ("ECMC") filed a motion to intervene in this matter and I allowed ECMC

to be substituted as a defendant for Massachusetts Higher Education Assistance Corporation.  Both

ECMC and the Educational Resources Institute, Inc. ("TERI") filed answers to the Complaint.  The

Debtor subsequently filed notices of stipulated dismissal with respect to FinanSure Student Loans,

LLC, and Pennsylvania Higher Education Assistance Agency.  The Student Loan Corporation did

not appear and defend in this adversary proceeding.  Following discovery and the filing of a Joint

1

Pre-Trial Memorandum, I conducted a trial on July 11, 2008.  At trial, the Debtor, Dr. Anthony R. Prizzi ("Dr. Prizzi"), her urologist, and Dr. Marc Whaley ("Dr. Whaley"), an independent psychiatrist, testified and three exhibits were accepted into evidence.[1]  At the conclusion of trial, I took the matter under advisement.  For the reasons set forth below, I will enter an order awarding judgment to the Defendants.

## II. BACKGROUND

The Debtor filed a voluntary Chapter 7 petition on October 14, 2005, and commenced the present adversary proceeding on December 25, 2005.  The Debtor is a thirty-four year old unmarried woman with no children who suffers from a number of physical and psychological conditions.[2]  According to her testimony, these conditions include: major depressive disorder, post-traumatic stress disorder, interstitial cystitis, endometriosis, eating disorders including bulimia and anorexia, gastroesophageal reflux disease, irritable bowel syndrome, and Lyme disease.[3]  At present, she does not work and her only source of income is Social Security Disability Income payments of approximately $785 per month.[4]  The Debtor's schedules indicate that her only property is a family dog, a non-functional 1985 BMW 325e, basic clothing with no resale value, and approximately $210.58 in a savings account.[5]  The Debtor lives in a single family home in East Harwich,

---

[1] While the Debtor testified live at the trial, the parties stipulated that the video depositions of Drs. Prizzi and Whaley, as well as the transcripts to those depositions, would be used at trial in lieu of live testimony.  Joint Pre-Trial Memorandum ("JPTM"), Docket No. 74, ¶ (C).

[2] Trial Trans. July 11, 2008 at 6, ¶16-20.

[3] Id. at 8, ¶ 1-24.

[4] Id. at 42, ¶ 17-18.

[5] Schedule B - Personal Property, Docket No. 1.  Schedule B reflects that as of the date she filed her petition, she had $1,011 in her savings account.  At trial, however, she testified that

Massachusetts, which her boyfriend owns.[6]  She has no interest in the property, nor any agreement with her boyfriend with respect to her right to live there in the event they break up.[7]

The Debtor graduated from Union College in Schenectady, New York, with a Bachelor of Arts degree ("B.A.") in sociology in 1996.[8]  She then attended Suffolk University Law School from 1996 through 1999, receiving a Juris Doctor degree ("J.D.") in 1999.[9]  Thereafter, the Debtor entered the accelerated Master of Business Administration ("MBA") program for law school graduates at Suffolk University's Sawyer Business School.[10]  She completed the program and received her MBA degree in July, 2000.[11]  To date, the Debtor has not passed the bar exam and has no plans to retake it in the future.[12]

The Debtor testified that her parents paid for her college education and that her post-graduate education was funded primarily by student loans.[13]  ECMC is the current holder of one of the Debtor's student loans that, as of July 8, 2008, has an outstanding balance $166,961.06 owed.[14]

---

the current balance of that account is only $210.58.  Trial Trans. July 11, 2008 at 48, ¶ 6-9.

[6] Trial Trans. July 11, 2008 at 6, ¶ 22-25; 7, ¶ 1-10.

[7] *Id.* at 7, ¶ 13-15.

[8] *Id.* at 22, ¶ 12-15.

[9] *Id.* at 22, ¶ 16-19.

[10] *Id.* at 22, ¶ 20-23.

[11] *Id.*

[12] *Id.* at 34, ¶ 3-11.

[13] *Id.* at 23, ¶ 4-19.

[14] Ex. D1-1.

3

TERI holds an additional five of the Debtor's student loans.[15]  As of July 9, 2008, TERI was owed a combined balance of $77,392.95 on account of these loans.[16]  In total, the Debtor owes over $244,354.01 on account of her student loans.  According to her schedules, these student loans are her only debt.

One of the many conditions the Debtor has been diagnosed with is post-traumatic stress disorder resulting from childhood sexual abuse.[17]  Dr. Whaley testified that post-traumatic stress disorder primarily causes hyper-vigilance symptoms, but can include flashbacks, obsessive preoccupations, memories of events, and avoidance behaviors.[18]  He further explained that hyper-vigilance symptoms cause an individual to be always on guard and suffer excessive anxiety with respect to anything that may have some connection to the memory of the underlying traumatic event.[19]

At trial, the Debtor testified that she first began suffering from post-traumatic stress disorder while in college when a friend's father who had sexually abused her as a child committed suicide.[20]  Her symptoms were exacerbated by subsequent events involving inappropriate sexual advances from a law school advisor, the husband of the Debtor's former employer, and an individual identified only

---

[15] Ex. D2-1.

[16] *Id.*

[17] Whaley Depo. Trans. Feb. 11, 2008 at 9, ¶ 1-3.  Although the testimony contained within the video depositions are part of the official trial transcript in this case, the poor quality of the audio recording resulted in "unclear" designations in the trial transcript.  Accordingly, I will cite to the deposition transcripts.

[18] *Id.* at 21, ¶ 2-15; 22, ¶ 1-14.

[19] *Id.* at 22, ¶ 15-20.

[20] Trial Trans. July 11, 2008 at 9, ¶ 3-22.

as "Grandpa."[21]   The Debtor stated that as a result of her post-traumatic stress disorder, she is emotionally fragile and is generally intimidated by and untrusting of men.[22]

Dr. Whaley also testified that the Debtor has been diagnosed with "a major depressive disorder that has been recurrent, chronic, and probably of a severe nature."[23]  He explained that:

> Major depressive disorder is a mood disorder, meaning that there is an aberration or an abnormality of the person's overall mood beyond just feeling negative about things.  It's a feeling where the person is dominated more or less by sad feelings, helpless feelings, negative thinking.[24]

Symptoms of major depressive disorder include loss of interest, low energy, poor concentration, guilty preoccupations, disturbed appetite, weight loss, either increased or decreased sleep, suicidal thoughts, and anxiety symptoms such as panic and over-reactivity to minor stressors.[25]  Although she never discussed her depression separately, the Debtor's testimony is filled with references to her lack of energy, focus, and interest, as well as constant fatigue.[26]  The Debtor expressly stated that she has no desire to get up in the morning or to do anything.[27]

The Debtor testified at length with respect to difficulties she experienced in law school due to extreme anxiety.  The Debtor alleged that during her first year, her criminal law grade was inadvertently recorded as an "F," even though her professor conceded on review that her exam

---

[21] *Id.* at 10, ¶ 10-18; 11, ¶ 14-25; 12, ¶ 18-25; 13, ¶ 1-8.

[22] *Id.* at 12, ¶ 10-17.

[23] Whaley Depo. Trans. Feb. 11, 2008 at 8, ¶ 16-24.

[24] *Id.* at 9, ¶ 13-22.

[25] *Id.* at 10, ¶ 1-8, 17-21.

[26] Trial Trans. July 11, 2008 at 16, ¶ 3-17; 22, ¶ 2-5; 36, ¶ 3-17; 41, ¶ 11-13.

[27] *Id.* at 41, ¶ 3-17.

deserved an "A."[28]  As there was no appeal process, the Debtor was forced to retake the course the following year.[29]  After that incident, the Debtor began suffering anxiety attacks during exams causing her to pass out before completing them.[30]  When this occurred, she had to repeat these courses the following year in addition to a regular course load, and pay an additional fee to re-take the class.[31]  Perhaps not surprisingly, the Debtor also suffered an anxiety attack during the bar exam that prevented her from completing it.[32]

As previously stated, the Debtor has also been diagnosed with eating disorders, including bulimia and anorexia.  Dr. Whaley explained that her diagnosis stems from her psychological compulsion to either avoid food or binge due to emotional triggers.[33]  The Debtor testified that in college, she became bulimic because she was concerned about gaining weight, but has since become a "fine tuned anorexic."[34]  Currently, she eats only one small meal a day, consisting of a slice of pizza, a salad, and a small snack.[35]

At the beginning of the trial, the Debtor stated that she has suffered from a number of physical conditions, including: interstitial cystitis, endometriosis, gastroesophageal reflux disease,

---

[28] *Id.* at 26-27.

[29] *Id.* at 27, ¶ 16-24.

[30] *Id.* at 28, ¶ 1-21.

[31] *Id.* at 31, ¶ 4-10.  The Debtor did not specify how many courses she was forced to repeat due to her inability to sit through exams.  I note, however, that she finished law school in the standard three years.

[32] *Id.* at 33, 34, ¶ 10-17.

[33] Whaley Depo. Trans. Feb. 11, 2008 at 26, ¶ 16-20; 27, ¶ 2-12.

[34] Trial Trans. July 11, 2008 at 21, ¶ 3-9.

[35] *Id.* at 21, ¶ 14-23.

irritable bowel syndrome, and Lyme disease.[36]  While the Debtor indicated in passing that her birth control pills were also used to treat her endometriosis, the trial testimony focused on her interstitial cystitis.[37]  As such, it is not clear whether Debtor currently suffers from gastroesophageal reflux disease, irritable bowel syndrome, and Lyme disease, and if so, what her symptoms are.[38]

After being initially mis-diagnosed as having a series of urinary tract infections in 1999, the Debtor was ultimately diagnosed with "mild to moderate interstitial cystitis."[39]  Dr. Prizzi explained that interstitial cystitis, also known as Painful Bladder Syndrome, is a chronic condition whereby hemorrhagic areas on the bladder cause pain and irritation, resulting in a constant, and sometimes urgent, need to void.[40]  In addition to frequency and urgency, sufferers often experience painful voiding and bleeding.[41]  These symptoms are exacerbated by both physical and emotional stress.[42]  Although Dr. Prizzi did not make this initial diagnosis, he testified that he agrees based on his observation of small hemorrhagic areas on the bladder during a hydro-distention procedure performed in October, 2004.[43]

The Debtor testified that due to her interstitial cystitis, she is in constant pain, and that her

---

[36] *Id.* at 8, ¶ 1-24.

[37] *Id.* at 40, ¶ 19-20.

[38] At trial, the Debtor stated, "I also *have suffered some* GERD and IBS; endometriosis, eating disorder, and Lymes [sic] disease." *Id.* at 8, ¶ 14-15 (emphasis added).

[39] *Id.* at 18, ¶ 4-6; Prizzi Depo. Trans. Feb. 11, 2008 at 9, ¶ 1-5.

[40] *Id.* at 13, ¶ 13-24; 14, ¶ 1-19.

[41] *Id.*

[42] *Id.* at 11, ¶ 2-7.

[43] *Id.* at 9, ¶ 10-24.

day to day symptoms include frequent and/or urgent need to void, difficulty sleeping, constant fatigue, dehydration, muscle soreness, and pain during sexual intercourse.[44] She stated that she voids as much as sixty times a day, and regularly spends hours in the bathroom.[45] The Debtor described her symptoms as feeling as if she is constantly trying to get rid of something by voiding, with an inability to obtain relief due to a perpetual lingering.[46] Moreover, the Debtor's sleep is frequently interrupted, and as a result, she sometimes sleeps on the bathroom floor.[47] The Debtor also testified to having "accidents" due to her frequent and urgent need to void, and believes she is beginning to suffer from incontinence.[48]

At trial, the Debtor described how interstitial cystitis impacts her quality of life. She first began experiencing symptoms during her MBA program, forcing her to complete it from her bed.[49] Afterwards, when the Debtor enrolled in a bar exam review course, she was similarly unable to attend all the classes because she did not feel well.[50] The Debtor further explained that her life centers around the bathroom because the frequency of her urges require her to always be near one and have the opportunity to use it.[51] As such, she is unable to sit through a movie or ride in a car

---

[44] Trial Trans. July 11, 2008 at 13, ¶ 9-22; 16, ¶ 3-17.

[45] *Id.* at 13, ¶ 23-25; 14, ¶ 5-8.

[46] *Id.* at 14, ¶ 8-11.

[47] *Id.* at 14, ¶ 3-9.

[48] *Id.* at 44, ¶ 15-20; 53, ¶ 3-4.

[49] *Id.* at 35, ¶ 1-4.

[50] *Id.* at 32, ¶ 2-25.

[51] *Id.* at 15, ¶ 18-25; 16, ¶ 3-17.

without making several stops.[52]  This is in part the reason she has not retaken the bar exam.[53]  The Debtor testified that she has no social life because her symptoms discourage her from going anywhere.[54]  When she is required to go somewhere, such as appointments with doctors or professionals, the Debtor restricts fluids in advance and will delay voiding as long as possible.[55]  She testified, however, that she did not restrict fluids before the trial.[56]

The Debtor is treated for these conditions with various medications.  For her post-traumatic stress disorder and major depressive disorder, the Debtor takes a combination of Zoloft and Wellbutrin, two antidepressants, and Diazepam, a tranquilizer.[57]  Dr. Whaley testified that this is a common combination of drugs used to combat depression and anxiety symptoms in conjunction with "talk therapy."[58]  These drugs help the Debtor function and she "swears" by Zoloft, but she did not specify whether she currently undergoes therapy with a psychiatrist.[59]  The Debtor takes Sanctura and Urelle for the frequency and urgency symptoms related to her interstitial cystitis.[60]  She testified that the Urelle noticeably helps, but colors her urine blue and stains anything it comes in contact

---

[52] *Id.* at 16, ¶ 20-25; 40, ¶ 22-24.

[53] *Id.* at 34, ¶ 5-11.

[54] *Id.* at 16, ¶ 3-17.

[55] *Id.* at 15, ¶ 15-17.

[56] *Id.* at 17, ¶ 16-19.  Based on the transcript, I note that she required five restroom breaks while testifying.  Unfortunately, the transcript does not reflect the times of those breaks so I am unable specifically gauge the frequency of her urges. *Id.* at 11, 17, 23, 31, 50.

[57] *Id.* at 41, ¶ 1-2.

[58] Whaley Depo. Trans. Feb. 11, 2008 at 17, ¶ 19-24; 18, ¶ 2-8.

[59] Trial Trans. July 11, 2008 at 41, ¶ 15-16.

[60] *Id.* at 18, ¶ 8-22.

with, such as toilet seats, undergarments, linens, and sometimes furniture in the event of an accident.[61] The Sanctura causes dehydration and dry eyes.[62] The Debtor testified that she was also proscribed Tramadon, a painkiller, but tries to avoid taking it as other painkillers have made her ill in the past.[63] Despite these treatments, the Debtor stated that her situation has "probably" worsened since she meet with Dr. Whaley.[64]

The expert testimony with respect to the Debtor's long term prognosis was largely inconclusive. Mindful that Dr. Prizzi's deposition was on February 11, 2008, he testified that he last saw the Debtor on December 18, 2007.[65] Dr. Prizzi clearly stated that he could not predict the future course of the Debtor's condition.[66] He conceded that interstitial cystitis is very difficult to treat and implied that the Debtor has effectively reached the limit of medical intervention short of the surgical removal of the bladder and installation of an external drainage bag.[67] Dr. Prizzi stated that he did not recommend such a procedure in the Debtor's case because it is radical and rarely performed.[68] He explained that the symptoms of interstitial cystitis wax and wane depending on stress and can be very debilitating.[69] While some patients with this condition are unable to function, many others learn

---

[61] *Id.* at 19, ¶ 1-11.

[62] *Id.* at 19, ¶ 17-21.

[63] *Id.* at 40, ¶ 21-24.

[64] *Id.* at 53, ¶ 1-3.

[65] Prizzi Depo. Trans. Feb. 11, 2008 at 8, ¶ 17-19.

[66] *Id.* at 24, ¶ 16-24.

[67] *Id.* at 9, ¶ 10-14; 20, ¶ 20-22.

[68] *Id.* at 23, ¶ 9-19; 23, ¶ 20-23.

[69] *Id.* at 24, ¶ 8-15.

to live with it when helped by medication.[70]  Dr. Prizzi further testified that because interstitial cystitis is a very individualized condition, sufferers may get worse over time, while others adjust and improve.[71]  Accordingly, he stated the Debtor is not unable to work per se, and that physical activities are unlikely to worsen her condition.[72]

Although Dr. Whaley offered more opinions, they are not definitive in light of his entire testimony.  I note that Dr. Whaley is not the Debtor's psychiatrist, and only met with her once, for ninety minutes, on May 23, 2006, over two years prior to the trial of this matter.[73]  Dr. Whaley testified that based upon his interview with the Debtor and a review of her patient records, it is his opinion that to a reasonable degree of medical certainty that the Debtor's conditions are chronic and have been little influenced by treatment.[74]  Notwithstanding this conclusion, he stated that treatment has helped the Debtor, and that there may be other drugs which, in connection with talk therapy, could be of further benefit.[75]  Dr. Whaley further explained that because her symptoms have been fully manifested for approximately nine years with very little change, her condition is unlikely to change in any significant way such that "she could achieve much in the way of gainful employment."[76]  He noted that, based on his general understanding of available jobs, the Debtor's psychological disorders would likely preclude her from working under a number of conditions,

---

[70] *Id.* at 25, ¶ 1-9.

[71] *Id.* at 25, ¶ 9-14.

[72] *Id.* at 27, ¶ 1-10; 30, ¶ 16-19.

[73] Whaley Depo. Trans. Feb. 11, 2008 at 8, ¶ 9-14; 34, ¶ 8-11.

[74] *Id.* at 29, ¶ 15-29.

[75] *Id.* at 24, ¶ 2-5; 29, ¶ 19-21.

[76] *Id.* at 30, ¶ 7-17.

including: having a male supervisor; having to interact with the public in an unstructured and significant way; having to take initiative to complete tasks; and having to work in a stressful environment.[77] As such, it is his opinion that, as a practical matter, the Debtor is totally and permanently disabled.[78] Dr. Whaley conceded, however, that this opinion was premised on his understanding that the Debtor's interstitial cystitis precludes most physical activities.[79] Dr. Whaley also admitted that he detected a "hint" of exaggeration with respect to her interstitial cystitis symptoms as she met with him for ninety minutes straight without excusing herself.[80]

As previously stated, the Debtor is currently unemployed. She testified that the last time she had a full time job was in 2002, when she worked as a personal assistant to a restaurant owner.[81] The Debtor described her duties as ranging from waitressing to performing household tasks and paperwork.[82] In this position, the Debtor worked forty hours a week and earned at least $300 per week.[83] The Debtor testified that she left this position because she felt overwhelmed and depressed, and that working around her health was problematic.[84] She also noted that she felt uncomfortable after an inappropriate sexual advance from her employer's husband.[85]

---

[77] *Id.* at 30-33.

[78] *Id.* at 32, ¶ 2-10.

[79] *Id.* at 8, ¶ 9-14; 34, ¶ 8-11.

[80] *Id.* at 38, ¶ 14-21.

[81] Trial Trans. July 11, 2008 at 25, ¶ 11-12.

[82] *Id.* at 35, ¶ 19-23.

[83] *Id.* at 35, ¶ 24-25; 36, ¶ 1-2.

[84] *Id.* at 36, ¶ 3-17.

[85] *Id.*

12

Prior to working as a personal assistant, the Debtor worked as a law clerk for several attorneys while in law school.[86]  Notably, she testified that she worked as a law clerk at Wynn & Wynn, P.C., from 1999 to 2001, while she was finishing her MBA Program.[87]  The Debtor further testified that she was offered a permanent position contingent on passing the bar exam.[88]  Unfortunately, she was unable to pass the bar exam.  The Debtor also testified that before law school, she held a number of jobs.  These jobs included working as a waitress at various restaurants,  a clerk in a clothing store, a legal secretary, and in an art gallery.[89]

Since 2002, the Debtor has periodically tried to work.  She testified that in the Summer of 2007, she was offered a job working a cash register at a friend's fish market.[90]  This ultimately did not work out because the Debtor was constantly in the bathroom, she could not interact with the public and was prone to crying for no reason, and her health made her unreliable.[91]  The Debtor also testified that she explored several ideas that would allow her to work from home.  First, she tried constructing various art projects for sale, but was unable to buy supplies.[92]  Second, the Debtor also tried to start a business with her sister making dog collars, leashes, and belts.[93]  This business

---

[86] *Id.* at 36, ¶ 18-19; 37, ¶ 1-8.

[87] *Id.* at 36, ¶ 6-8.  The Debtor stated that she was a bit confused about the dates, but remembered that her end date at Wynn & Wynn, P.C., was before the bar exam.

[88] *Id.* at 37, ¶ 9-14.

[89] *Id.* at 25, ¶ 10-19.

[90] *Id.* at 38, ¶ 1-20.

[91] *Id.* at 38, ¶ 22-25; 36, ¶ 1-6.

[92] *Id.* at 43, ¶ 5-7.

[93] *Id.* at 43, ¶ 11-15.

apparently failed due to financial reasons.[94]  Third, the Debtor stated she "tried" an "envelope stuffing scam," but did not have money to invest in the necessary supplies.[95]  It is unclear whether she meant that she tried and was unable to continue, or merely considered this option.

At trial, when asked whether she was actively seeking work, the Debtor testified:

> I'm going to say no because I just want this trial to be over.  I know that there's no job - -  I know through my history and what's happened so far what employees [sic] are looking for and what they're not looking for, and I fit the category of everything they don't need right now, and I have a stack in my purse of all the job applications I've done, filled out, and mailed out, and handed in.[96]

The Debtor did not elaborate further on where she sought work.  She did, however, explain that her frequent need to use the restroom makes her unreliable for any job.[97]  Additionally, she stated that her body is constantly sore, and that she would "rather not" engage in physical activities.[98]  Although she has worked as a waitress in the past, she claimed that cannot do so now because she shakes and cannot remember things.[99]  She also testified that she would not be comfortable working a cash register because she cannot stand the entire time or interact with the public, and her mind is clouded by medications.[100]  With respect to using the internet to work from home, the Debtor explained that she does not own a computer, and her boyfriend's is no longer functional.[101]

---

[94] *Id.*

[95] *Id.* at 42, ¶ 23-25.

[96] *Id.* at 42, ¶ 10-17.

[97] *Id.* at 39, ¶ 10-17.

[98] *Id.* at 22, ¶ 2-5; 39, ¶ 10-17.

[99] *Id.*.

[100] *Id.* at 40, ¶ 3-14.

[101] *Id.* at 43, ¶ 1-4.

As stated above, the Debtor's sole source of income is $785 per month in Social Security Disability Income.[102] During the trial, the Debtor testified with respect to her modest expenses. She pays approximately $120 per month for her cell phone, although she frequently has a balance left over from month to month.[103] The Debtor spends approximately $250 per month on toiletries, pharmacy items, female hygiene products, adult diapers, bleach, and other stain removers.[104] Her monthly food expenses, including food for her dog, are approximately $200.[105] Because the Debtor suffers "accidents," she spends approximately $200 per month replacing stained home goods, including: linens, rugs, toilet seats, undergarments, and clothes.[106] Although her car is non-functional, she estimated her monthly gas expenses to get to doctor's appointments to be $60 per month.[107] The Debtor has no health insurance of her own, but does have either Medicare or Mass Health.[108] As a result, she does not pay anything for doctor visits and pays only $5.00 for each of her six prescriptions, per month.[109] It is unclear whether the Debtor included her prescriptions within her expenses for "pharmacy items." In any event, her expenses each month are at least $45 more than her Social Security Disability Income.

---

[102] *Id.* at 42, ¶ 5-9.

[103] *Id.* at 43, ¶ 18-23.

[104] *Id.* at 44, ¶ 1-9.

[105] *Id.* at 44, ¶ 10-11.

[106] *Id.* at 44, ¶ 13-20.

[107] *Id.* at 45, ¶ 6-10. I assume she means that she pays others for the gas expended in driving her to her appointments.

[108] *Id.* at 45, ¶ 11-15.

[109] *Id.* at 45, ¶ 16-25.

The parties stipulated that ECMC previously forwarded a letter to the Debtor in May, 2006, informing her of her right under federal law to consolidate her ECMC held student loan with the United States Department of Education under the William D. Ford Direct Loan Program (the "Ford Program").[110]  The parties have also stipulated that the Debtor declined to enter the Ford Program.[111] The Debtor did not elaborate on her refusal during the trial.

At Defendants' request, I took judicial notice of the Ford Program.  The Ford Program offers four student loan repayment options known as the standard repayment plan, the extended repayment plan, the graduated repayment plan, and the income contingent repayment plan (the "ICRP").[112]  The Defendants contend that under the first three repayment options that the Debtor's payments would be between $1,113.33 and $1,225.39 per month.[113]  In *Brunell v. Citibank, N.A. (In re Brunell),* I summarized the ICRP as follows:

> [The ICRP] provides for a monthly payment based upon the borrower's annual income, the total amount borrowed and family size. These payments can be as low as zero. Since the payments ordinarily would not be sufficient to cover the amount of interest accruing on the loan, this amount would be added to the principal balance only until 10% more than the original principal balance is reached. At that point interest would continue to accrue but not be added to the principal balance. Her payment amount for each year would be set based upon the adjusted gross income filed in her annual return. Upon enrollment in the Ford program, the Debtor would also become eligible for deferments or forbearance from making payments on her student loan based upon negative changes to her financial situation.[114]

---

[110] JPTM, Docket No. 74, ¶ (G).2.

[111] *Id* at ¶ (G).3.

[112] *See* 34 C.F.R. § 685.208.

[113] Post Trial Brief of the Defendant, Educational Credit Management Corporation, Docket No. 81, p5-6.

[114] *Brunell v. Citibank, N.A. (In re Brunell)*, 356 B.R. 567, 574-575 (Bankr. D. Mass. 2006).

The Defendants assert that under the ICRP, the Debtor's payment on account of her student loans would be zero.  Under the ICRP, any remaining balance on the loan at the end of the twenty-five year repayment period would be cancelled.[115]  Furthermore, under the Ford Program, borrowers may seek an administrative discharge of their student loan debt in the event of total and permanent disability.[116]

## III. <u>POSITIONS OF THE PARTIES</u>

### A. <u>The Debtor</u>

The Debtor contends that under any common sense test, repayment would cause her undue hardship within the meaning of 11 U.S.C. § 523(a)(8) and her student loan debt should therefore be discharged.  She argues that Dr. Prizzi testified that interstitial cystitis is a permanent condition barring hypothetical future advances in treatment.  The Debtor has attempted all known treatments, with the exception of the surgical removal of her bladder which her doctor does not recommend, and the condition persists.  She also asserts that in the opinion of Dr. Whaley, her illnesses are severe and permanent enough to preclude her from gainful employment as a practical matter.  Moreover, the Debtor presently receives only $785 per month in Social Security Disability Income, which does not even cover her monthly expenses.  As such, she contends that she subsists solely through the kindness of others, namely, her boyfriend.

To the extent that the Defendants advocate the availability of the zero payment option under the Ford Program, the Debtor asserts that such an option does not obviate undue hardship.  She notes that no evidence was presented indicating whether the Debtor qualifies for the program or how its complex provisions would apply in this case.  Relying on Judge Rosenthal's opinion in *In re*

---

[115] *See* 34 C.F.R. § 685.209(c)(4)(iv).

[116] *See* 34 C.F.R. §§ 682.402(c)(1)-(2); 685.213.

*Denittis*,[117] the Debtor asserts that even if I were to assume that she qualified for the Ford Program and would be entitled to a zero payment, I should nonetheless discharge her student loans in order to grant her the fresh start that the Bankruptcy Code envisages.

B. The Defendants

The Defendants argue that the Debtor cannot demonstrate an undue hardship under any standard, but urge me to adopt the test set forth in *In re Brunner*.[118]  Generally, the Defendants rest their case on the availability of the ICRP.   The Defendants assert that because the Debtor could consolidate under the Ford Program and "pay" zero dollars per month, she has not made a good faith effort to repay her student loans.   Moreover, they argue that because she could make a zero payment under the ICRP, she effectively has a present ability to repay the student loans even though she would not technically be repaying anything.   To the extent that I could find that an income tax liability would arise at the end of the ICRP payment period, the Defendants urge me to rule as I did in *In re Brunell*,[119] and find that the income tax liability is dischargeable as it would pose an undue hardship.

The Defendants further assert that the Debtor has not made a good effort to repay because she has not taken reasonable steps to maximize her income, such as obtaining part time employment, before seeking a discharge of her student loans.   If I were to find that the Debtor has a present inability to repay her student loans, the Defendants argue, without citing facts in support, that I could

---

[117] *Denittis v. Educ. Credit Mgmt. Corp. (In re Denittis)*, 362 B.R. 57 (Bankr. D. Mass. 2007).

[118] *Brunner v. New York State Higher Educ. Servs. Corp. (In re Brunner)*, 831 F.2d 395 (2d Cir. 1987).

[119] *In re Brunell*, 356 B.R. at 580.

18

find that there is a reasonable likelihood of improvement in the future. As such, the Defendants also contend that due to the Debtor's advanced education, I could reasonably find that it will be a valuable financial resource to her throughout her life, giving her an advantage in the job market and assist the Debtor in her career. Relying on *Lorenz v. American Education Services*,[120] the Defendants assert that I should consider the income of the Debtor's boyfriend when determining the Debtor's present ability to repay her student loans.

Lastly, to the extent that I find that repayment of the Debtor's student loans would pose an undue hardship, the Defendants urge me to discharge only that portion of the loan, or loans, that constitute an undue hardship.

## IV. DISCUSSION

Under 11 U.S.C. § 523(a)(8), an educational debt is not dischargeable unless the debtor can establish that the repayment of the debt would impose an undue hardship on the debtor and the debtor's dependents.[121] "The creditor bears the initial burden of demonstrating that the debt exists and that the debt is the type excepted from discharge under § 523(a)(8)." Here, it is not disputed that the loans fall under the purview of 11 U.S.C. § 523(a)(8). With this threshold issue resolved, the

---

[120] *Lorenz v. Am. Educ. Servs. (In re Lorenz)*, 337 B.R. 423 (B.A.P. 1st Cir. 2006).

[121] Section 523(a) was amended in by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Because this case was filed on October 14, 2005, three days prior to the effective date of BAPCPA, the version of 11 U.S.C. § 523(a)(8) that was in effect as of the petition date is applicable. It provided in relevant part:
> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtors dependents . . . .

burden shifts to the debtor to demonstrate that excepting the student loan from discharge will cause her an undue hardship.[122]

"Undue hardship" is not defined in the Bankruptcy Code, and courts have employed several tests to evaluate undue hardship claims under 11 U.S.C. § 523(a)(8).   "Courts have generally adopted one of two approaches: the totality of the circumstances approach or the widely-accepted *Brunner* test, which requires a showing that '(1) the debtor cannot maintain, based current income and expenses, a 'minimal' standard of living for [himself] and [his] dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.'"[123]   The United States Bankruptcy Appellate Panel for the First Circuit stated the following with respect to the two tests:

> The significant difference between the *Brunner* approach and the totality of the circumstances test is the requirement in *Brunner* that a debtor demonstrate that she has made good faith efforts to repay the educational loans at issue.
>
> * * *
>
> Under Brunner, the Debtor's failure to make a good faith effort to repay the loans would result in a conclusion of nondischargeability.   Under the totality of circumstances approach, a debtor's failure to make a good faith repayment effort is an additional factor to be weighed, but not necessarily a determinative factor.[124]

In the absence of controlling authority, courts have been free to choose their own approach in

---

[122] *In re Brunell*, 356 B.R. at 575.

[123] *Paul v. Suffolk Univ. (In re Paul)*, 337 B.R. 730, 735 (Bankr. D. Mass. 2006) (*quoting In re Brunner*, 831 F.2d at 396).

[124] *Educ. Credit Mgmt. Corp. v. Kelly (In re Kelly)*, 312 B.R. 200, 206-207 (B.A.P. 1st Cir. 2004).

evaluating undue hardship.[125]  I, like many other courts in the First Circuit, have adopted the totality

of the circumstances test.[126]

In *In re Lorenz*, the Panel articulated the totality of the circumstances test as follows:

The "totality of the circumstances" analysis requires a debtor to prove by a preponderance of the evidence that (1) his past, present, and reasonably reliable future financial resources; (2) his and all his dependents' reasonably necessary living expenses; and (3) other relevant facts or circumstances unique to the case, prevent him from paying the student loans in question while still maintaining a minimal standard of living, even when aided by a discharge of other pre-petition debts. *Kopf*, 245 B.R. at 739; *see also Hicks v. Educ. Credit Mgmt. Corp. (In re Hicks)*, 331 B.R. 18, 31 (Bankr. D. Mass. 2005) (distilling so-called totality of the circumstances to "one simple question: *Can the debtor now, and in the foreseeable future, maintain a reasonable, minimal standard of living for the debtor and the debtor's dependants and still afford to make payments on the debtor's student loans?*"). Courts "should consider all relevant evidence--the debtor's income and expenses, the debtor's health, age, education, number of dependents and other personal or family circumstances, the amount the monthly payment required, the impact of the general discharge under chapter 7 and the debtor's ability to find a higher-paying job, move or cut living expenses." In addition, other factors not listed here may impact a debtor's case. *Hicks*, 331 B.R. at 31; *see also Kelly*, 312 B.R. at 206; *[Educ. Credit Mgmt. Corp. v. Savage (In re Savage)*, 311 B.R. 835] at 840 [(B.A.P. 1st Cir. 2004)]; *Bloch v. Windham Prof'ls (In re Bloch)*, 257 B.R. 374, 378 (Bankr. D. Mass. 2001); *Kopf*. 245 B.R. at 744.[127]

While the Debtor's story is undoubtedly a sad one, the determination of undue hardship

remains difficult.  In the present case, the Debtor's health is the central factor impacting all others.

---

[125] *Id.*; *see also Nash v. Conn. Student Loan Found. (In re Nash)*, 446 F.3d 188, 190-91 (1st Cir. 2006) (declining to adopt a preferred method for determining undue hardship under 11 U.S.C. § 523(a)(8)).

[126] *In re Brunell*, 356 B.R. at 576; *Gharavi v. U.S. Dept. of Educ. (In re Gharavi)*, 335 B.R. 492, 497 (Bankr. D. Mass. 2006); *Austin v. Educ. Credit Mgmt. Corp. (In re Austin)*, No. 03-18868-WCH, 2005 WL 3320568 (Bankr. D. Mass. Oct. 19, 2005); *see also In re Denittis*, 362 B.R. at 63;  *Hicks v. Educ. Credit Mgmt. Corp. (In re Hicks)*, 331 B.R. 18, 32 (Bankr. D. Mass. 2005); *Lamanna v. EFS Servs., Inc. (In re Lamanna)*, 285 B.R. 347, 353 (Bankr. D.R.I. 2002); *Kopf v. United States Dept. of Educ. (In re Kopf)*, 245 B.R. 731, 741 (Bankr. D. Me.2000).

[127] *In re Lorenz*, 337 B.R. at 430-431 (emphasis added).

The record clearly establishes that the Debtor suffers from a plethora of ailments.  The Debtor's testimony regarding her symptoms, however, is not entirely credible.  While I have no doubt that the Debtor experiences pain, urinary frequency and/or urgency, and even occasional incontinence, I find that her testimony as to the severity of these symptoms was likely exaggerated. This is consistent with Dr. Whaley's observation that the Debtor never excused herself during his ninety minute interview despite her claim that she could not go more than fifteen to twenty minutes without using the restroom.  Notably, the Debtor did not call any witnesses, such as her boyfriend, who could have corroborated her story with their personal observations.

Dr. Prizzi admitted that the course of interstitial cystitis is difficult to predict because although it is a chronic condition, the symptoms are very individualized and tend to wax and wane. He expressly stated that although some are debilitated by this condition, others are able to function when helped by medications.  Interstitial cystitis is not necessarily progressive, and according to Dr. Prizzi, many sufferers adjust to their condition and improve their quality of life.  Admittedly, Dr. Prizzi also stated there are those whose conditions worsen over time.  Even assuming the Debtor is currently debilitated and has presently reached the limit of medical treatment short of a radical and invasive procedure, based on Dr. Prizzi's testimony, I find that her condition may improve in the reasonably foreseeable future.

While Dr. Whaley's testimony was informative, it is not determinative, and only mildly persuasive. First, Dr. Whaley is not the Debtor's psychiatrist, and only met with her once, for ninety minutes, before concluding that the Debtor's psychological conditions are unlikely to be significantly influenced by further treatment.  Under those circumstances, I find his conclusion somewhat dubious.  Second, this meeting took place over two years prior to the trial of this matter.  As I must

determine undue hardship as of the trial date, I recognize that Dr. Whaley's opinions may not accurately reflect the Debtor's current condition, and must weigh this evidence accordingly.  Third, Dr. Whaley's opinions were clearly influenced by  the Debtor's biased and exaggerated description of her symptoms.  This is apparent from his understanding that the Debtor's interstitial cystitis precludes her from most physical tasks, which is not consistent with Dr. Prizzi's testimony.  In this light, it seems clear that his opinion as to the Debtor's disability was based, at least in part, on a faulty premise.  Lastly, Dr. Whaley is not a vocational expert, and his assertion that the Debtor is totally and permanently disabled from gainful employment based on his general understanding of available jobs must be viewed in that light.  While the Debtor's health may place a number of conditions and restrictions on her ability to effectively maintain employment, it is not within Dr. Whaley's expertise to conclude that the Debtor is precluded from doing so.  Moreover, while he opined that it was unlikely that she would achieve much in the way of gainful employment, he did not say she was incapable of working at all.

The Debtor, however, testified that due to her physical and psychological symptoms, there are no jobs for her.  Despite purporting to have a "pile of applications," the Debtor did not explain what she has done, aside from temporarily working as a cashier at a fish market, to find employment.  To the contrary, the Debtor's testimony clearly reflects that she has given up.

Debtors who seek an undue hardship discharge of their student loans while remaining unemployed face a difficult burden because they must demonstrate that they are both presently, and in the reasonably foreseeable future, incapable of obtaining gainful employment and improving their situation.  I concede that the Debtor's symptoms would likely make maintaining employment difficult, but not impossible.  The Debtor's own testimony reflects that she has successfully

maintained employment while suffering from her various conditions in the past.  The Debtor was

clearly able to successfully function during her term of employment at Wynn & Wynn, P.C., as she

stated that they offered her a permanent position, albeit contingent on her passing the bar exam.  I

note her employment there was concurrent with her MBA Program, during which time she asserts

that she was periodically bedridden.  The Debtor also testified that while working as a personal

assistant, she was able to work around her illnesses.  At trial, she did not state affirmatively that her

condition has worsened, but instead suggested that it "probably" had based on an increased

incontinence symptoms.

I am also unconvinced that the Debtor has exhausted her options with respect to working

from home.  Although she testified that she did try two craft for sale possibilities that failed, this is

insufficient.  In an age of advanced telecommunications and networking, it is reasonable to conclude

that the Debtor likely has more home employment options than she explored.  Additionally, while

a home employment opportunity requiring an initial investment may be difficult for the Debtor to

afford, it does not render it permanently unviable.  I also note that the Debtor's boyfriend, based on

her testimony, helps subsidize her life, and therefore, an initial investment in order to make her

financially productive may be in his interests.

Ultimately, I am unconvinced that the Debtor's conditions permanently preclude her from

obtaining gainful employment.  The Debtor holds three degrees and has demonstrated motivation

and the ability to work around her health problems in the past.  As such, I find it likely that in the

reasonably foreseeable future the Debtor could obtain some form of employment and increase her

income.

I am also troubled by the Debtor's failure to explain why she declined to consolidate under

the Ford Program.  The Debtor is correct that the Defendants offered no evidence at trial with respect to how the Ford Program would apply to her loans.  I also agree that the existence of a zero payment under the ICRP does not generally obviate the need for undue hardship discharges in bankruptcy. The Defendants would be well advised to take note of that, as they were similarly admonished by Judge Rosenthal in *In re Denittis*, but still filed generic briefs in this case totaling over fifty pages with almost no references to the present facts.[128]  Regardless, the availability of the Ford Program, specifically the ICRP, is a relevant consideration to the determination of undue hardship and it was the Debtor's burden to come forward with evidence as to why it is not a viable alternative.[129]

In sum, under the totality of the circumstances the Debtor has not met her burden in demonstrating, by a preponderance of the evidence, that repayment of her student loans would impose an undue hardship.  That is not to say this was not a close case.  I am not unsympathetic to the Debtor's difficulties and am mindful that her condition could worsen making any employment impossible.  Although I cannot force the Debtor to consolidate under the Ford Program, if she were to do so, I would consider another request for the discharge of any tax liability based on the any

---

[128]       In that case, Judge Rosenthal observed:

> Most troubling about ECMC's attempts to force the Debtor into the Ford program, however, is that such use of the program removes from this Court's consideration the very issue Congress entrusted to the Court, namely the repayment of the debt would impose an undue hardship. To hold that debtors must participate in the Ford program, if eligible, would be no more than the Court abdicating its responsibility to determine the dischargeability of a student loan. If this is the outcome Congress intended, it would have said so, especially since Congress undertook a major revision to the Bankruptcy Code in the BAPCPA.

*In re Denittis*, 362 B.R. at 64-65

[129] I note that if the Debtor is in fact disabled, or becomes disabled, she could apply for an administrative discharge of her student loans under the Ford Program.  *See* 34 C.F.R. §§ 682.402(c)(1)-(2); 685.213.

25

forgiven balance at the end of the ICRP term.[130]

## V. CONCLUSION

In light of the foregoing, I will enter an order entering judgment to the Defendants.

_____
William Hillman
United States Bankruptcy Judge

Dated: September 17, 2008

---

[130] *See In re Brunell*, 356 B.R. at 580-581.

26